

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00222-CR

OCTAVIOUS LAMAR RHYMES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CF-15-1523

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

After their original plan to plant illicit drugs in Ernest Lee Ibarra, Jr.'s, truck was abandoned, Johnathan Sanford, Jose Ponse, and Octavious Lamar Rhymes quickly devised another plan: they would kidnap and murder Ibarra instead. Within hours, they kidnapped Ibarra from his Titus County home and transported him to some isolated woods in Camp County where he was shot to death. Consequently, Sanford, Ponse, and Rhymes were each charged with aggravated kidnapping[1] in Titus County and with murder[2] in Camp County.

Sanford and Ponse pled guilty to the charges and were sentenced to fifty years' imprisonment for both the aggravated kidnapping and the murder convictions, with the sentences to run concurrently. After a jury trial, Rhymes was convicted in Titus County of aggravated kidnapping and was sentenced to twenty-three years' imprisonment.[3] Rhymes was later tried in Camp County, where a jury convicted him of murder and assessed him seventy-five years' imprisonment, which the trial court ordered to be run consecutively to his Titus County sentence.

In his first point of error, Rhymes (1) challenges the sufficiency of the evidence supporting his conviction and (2) complains that the trial court failed to include an accomplice-witness instruction in its jury charge.[4] In his second point of error, Rhymes asserts that the trial court erred

---

[1]*See* TEX. PENAL CODE ANN. § 20.04 (West 2011).

[2]*See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

[3]Rhymes dismissed his appeal of the Titus County conviction.

[4]Although Rhymes asserts this issue in support of his sufficiency issue and asks us to disregard the accomplice testimony, we consider all of the evidence received at trial in our sufficiency review. *See Hall v. State*, 161 S.W.3d 142, 148 (Tex. App.—Texarkana 2005, pet. ref'd). Therefore, we will treat this issue as asserting jury charge error. To the extent Rhymes' complaint is that the non-accomplice corroborating evidence is insufficient, we find in our

2

in overruling his motion to quash the indictment because of prosecutorial and judicial vindictiveness. In his third point of error, Rhymes asserts that he received ineffective assistance of counsel at trial. Because we find (1) that sufficient evidence supports the conviction, (2) that any jury charge error was harmless, (3) that the trial court did not err in denying Rhymes' motion to quash, and (4) that ineffective assistance of counsel has not been shown, we will affirm the trial court's judgment.

## I. The Trial Court's Error in Failing to Give a Proper Accomplice-Witness Instruction Was Harmless

### A. Introduction

We first address Rhymes' complaint that the trial court erred in failing to given an accomplice-witness instruction.

### B. Standard of Review

We review an alleged error in an accomplice-witness instruction under the procedural framework of *Almanza*.[5] *Zamora v. State*, 411 S.W.3d 504, 512 (Tex. Crim. App. 2013) (citing *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012); *Herron v. State*, 86 S.W.3d 621, 631–32 (Tex. Crim. App. 2002); *Medina v. State*, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999)). Under this framework, we employ a two-step process in our review of the alleged error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require

---

charge error analysis that such evidence is sufficient. Additionally, we note that Rhymes did not object or request additional instructions to the jury charge at trial.

[5]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32). In examining the charge for possible error, appellate courts "must examine the charge as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). Only if we find error do we analyze that error for harm. *See Abnor*, 871 S.W.2d at 731.

### C. Analysis

#### 1. The Trial Court Failed to Give a Proper Accomplice Witness Instruction

Sanford participated in the kidnapping and murder, and he pled guilty to the aggravated kidnapping and murder of Ibarra. Therefore, he was an accomplice as a matter of law. *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). "If a witness is an accomplice as a matter of law, the trial court is required to provide an accomplice-witness instruction to the jury." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). The instruction must explain the definition of an accomplice and inform the jury that the witness is an accomplice as a matter of law. *Zamora*, 411 S.W.3d at 510. It must also instruct the jury regarding the requirements of Article 38.14. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Zamora*, 411 S.W.3d at 510.

If a State witness is an accomplice as a matter of law, the trial court has a duty to include a proper accomplice-witness instruction in its jury charge, and failure to do so is error. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). In this case, although the trial court instructed the jury regarding the requirements of Article 38.14, it failed to include the definition of an

4

accomplice and identify Sanford as an accomplice as a matter of law. Therefore, the trial court erred in failing to give a proper accomplice-witness instruction.

## 2. The Trial Court's Error Did Not Harm Rhymes

Next, we must determine whether Rhymes was harmed by the trial court's omission. "Where the evidence clearly shows a witness is an accomplice as a matter of law, the trial court must so instruct the jury, but if the appellant fails to object to the omission of the instruction, as in [Rhymes'] case, he or she must prove egregious harm to prevail on appeal." *Hall*, 161 S.W.3d at 149. Article 38.14 provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14.

The purpose of this instruction is to inform "the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice witness evidence connecting the defendant to the offense." *Herron*, 86 S.W.3d at 632. Generally, in an egregious harm analysis, "non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve." *Id.* However, there may be harm if "the corroborating (nonaccomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Hall*, 161 S.W.3d at 150 (quoting *Herron*, 86 S.W.3d at 632).

To evaluate the sufficiency of corroboration evidence, we eliminate the accomplice-witness testimony from our consideration and examine the non-accomplice evidence "to ascertain

5

if there is evidence which tends to connect the accused with the commission of the offense." *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997) (citing *Reed v. State*, 744 S.W.2d 112, 125 (Tex. Crim. App. 1988)); *Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994); *Hall*, 161 S.W.3d at 150. The non-accomplice evidence need not establish guilt beyond a reasonable doubt or directly link the defendant to the crime. *Hernandez*, 939 S.W.2d at 176; *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). Rather, "[t]he accomplice witness rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Hernandez*, 939 S.W.2d at 176 (citing *Gill*, 873 S.W.2d at 48 (citing *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), *cert. denied*, 509 U.S. 922 (1993)); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)).

Evidence placing the defendant "in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence." *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (citing *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex. Crim. App. 1988); *Burks*, 876 S.W.2d at 887–88). Further, "[i]n determining the strength of the particular item of nonaccomplice evidence, we must examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *Hall*, 161 S.W.3d at 150 (citing *Herron*, 86 S.W.3d at 632).

In this case, the non-accomplice evidence consisted of: (1) Rhymes' admissions that (a) he knew of the plan to murder Ibarra, (b) he assisted in obtaining the gloves used in the murder, (c) he assisted in the kidnapping of Ibarra, (d) he participated in taking Ibarra into the woods, and (e) he saw Ponse shoot Ibarra; (2) the facts that Rhymes received warning text messages from Wohlford

6

during the timeframe that Ibarra was being transported to the woods and shortly after the murder; and (3) the fact that the murder weapon was found underneath Rhymes' residence. Although the location of the murder weapon could be attributed to Ponse, who was also residing at Rhymes' house, we find that the remaining evidence is reliable and clearly connects Rhymes to the murder. Therefore, we hold that the trial court's error was harmless and overrule this issue.

## II.     Legally Sufficient Evidence Supports the Jury's Verdict

### A.     Standard of Review

We next consider Rhymes' complaint regarding the sufficiency of the evidence. In evaluating legal sufficiency,[6] we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). In our review, we focus on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). Legal sufficiency is reviewed under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In drawing reasonable inferences, the jury "may use common sense

---

[6]In support of his sufficiency complaint, Rhymes asserts that the trial court erred in denying his motion for directed verdict asserted at the conclusion of the State's case-in-chief. A complaint about the denial of a motion for directed verdict is treated as a challenge to the legal sufficiency of the evidence. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. denied) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). Further, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Paroline v. State*, No. 06-16-00101-CR, 2017 WL 1178637, at *4 (Tex. App.—Texarkana 2017, no pet. h.) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Under the indictment and the statute, the State was required to show beyond a reasonable doubt that, on or about February 20, 2015, Rhymes (1) either acting alone or as a party, (2) intentionally or knowingly (3) caused the death of (4) Ibarra. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Rhymes challenges the sufficiency of the evidence supporting a finding that anyone intentionally caused Ibarra's death, or that he was criminally responsible as a party.

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011); *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). In determining whether an appellant is a party to an offense, we may consider "events before, during, and after the commission of the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). We may consider circumstantial evidence and look to the actions of the defendant showing an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

9

"Proof of a culpable mental state is often made by circumstantial evidence." *Louis v. State*, 329 S.W.3d 260, 268 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012) (citing *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.)). In determining a defendant's state of mind, the jury may consider all of the circumstances. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998). The jury may infer the requisite mental state from (1) the acts, words, and conduct of the defendant, (2) the extent of the injuries to the victim, (3) the method used to produce the injuries, and (4) the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Duren*, 87 S.W.3d at 724. In homicide prosecutions, although the intent to kill may not be presumed, "the jury may . . . infer intent from any facts in evidence which it determines proves the existence of [an] intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)).

## B.  Summary of the Evidence

In the State's case-in-chief, Sanford provided many of the details surrounding the kidnapping and murder of Ibarra. Sanford testified that he had already been convicted for those offenses. He met Samantha Wohlford, Ibarra's wife, on February 14, 2015, through a mutual friend, Sharla Kemp. Five days later, Sanford, Rhymes, and Wohlford were at the Titus County Regional Medical Center visiting Kemp, who had had a baby. Wohlford began complaining to Sanford and Rhymes about Ibarra abusing her, and the three devised a plan to plant methamphetamine in Ibarra's vehicle and make an anonymous tip to the police.

10

Around 9:00 that night, the three obtained the methamphetamine from Rhymes' cousin in Mount Vernon. They then returned to Rhymes' house in Pittsburg where Ponse was cooking enchiladas with his girlfriend. After Sanford shared with Ponse the plan to "set up" Ibarra, the two decided it would be better to find a way that did not involve the police. They joked with Rhymes that it would be better to just kill Ibarra, but rather quickly the joke became their serious plan. Sanford testified that Rhymes was present and participating throughout all of this, although he was not sure Rhymes fully understood. He testified that their plan was to kidnap Ibarra, then take him to a remote location in Camp County and kill him.

Sanford and Rhymes then took Wohlford and her children to her house and removed the toddler's car seats from Wohlford's vehicle. Next, Sanford and Rhymes took enchiladas to Kemp at the hospital[7] and then went to Walmart, where they shoplifted three pairs of black gloves from the sporting goods department. Sanford also identified still shots taken from a Walmart security camera as showing Rhymes and him entering Walmart at 12:12 a.m. on February 20.[8] After leaving Walmart, Sanford and Rhymes returned to Rhymes' house, picked up Ponse, and proceeded to Ibarra's and Wohlford's residence wearing the gloves obtained at Walmart.

At the residence, they gained entrance through the front door, which was left unlocked by Wohlford. They proceeded upstairs, where Sanford pulled Ibarra from the bed while Rhymes took Wohlford downstairs to make sure she was not injured. After Sanford and Ponse beat Ibarra into

_____

[7]Sanford identified a still shot taken from the security camera outside of Kemp's hospital room as showing Rhymes leaving Kemp's room at 11:57 p.m. on February 19, 2015.

[8]The State also introduced video recordings and still shots from Walmart from the morning of February 20 showing the same two individuals going to the sporting goods department, picking up gloves, and then leaving Walmart at 12:18 a.m.

11

submission, they took him downstairs, where they continued the beating. To give Wohlford a cover story, Sanford and Ponse told Ibarra that he was being beaten and kidnapped because his father owed them money. Rhymes then took Wohlford upstairs where he was to tell her that they were going to handle the rest and to wait until Sanford contacted her.

Meanwhile, Ibarra's hands were tied behind his back with painter's masking tape, and he was taken outside. Sanford and Ponse leaned Ibarra against his truck, then they rummaged through the truck. Rhymes came outside and struck Ibarra in the mid-lower back with a small log. Rhymes and Ponse then hurriedly forced Ibarra into the back of Wohlford's vehicle, and they got in the vehicle.

They then proceeded to Sand Crossing in Camp County, where they removed Ibarra from the vehicle and forced him to walk on a game trail through the woods. Sanford led Ibarra, with Ponse and Rhymes following. About fifty yards into the woods, Ibarra tripped and fell face down. As he got back up to his knees, Ponse shot him in the back of the head. After confirming that Ibarra was dead, they returned to Rhymes' house, where they removed their clothes and burned them.

Sanford and Ponse then drove to the hospital to pick up Kemp, who was being released that morning. As Sanford and Ponse were leaving the hospital, they were detained by Titus County deputies. Sanford confessed later that day and took the deputies to Ibarra's body. He also took them to the murder weapon at Rhymes' house. Sanford also testified that Rhymes never objected to their plan and never indicated that he was not completely in agreement with it.

12

On cross-examination, Sanford testified that he was surprised when Ponse shot Ibarra. He also testified that he was the one that organized the plan, but that Ponse and Rhymes followed along. He said that, if Rhymes had asked him to let him out of the vehicle after they had Ibarra, he would have done so. He also said that, if Rhymes had not been in on the kidnapping, he would not have followed through with it at that time. However, he also agreed that, if Rhymes tried to pull out after they began, he would have had to kill him.

The State also introduced Rhymes' recorded custodial interview. Initially, Rhymes acknowledged that Wohlford told them at the hospital that she wanted someone to beat up her husband, but he denied any knowledge about the murder. He maintained that he had left the hospital at 12:15 and that he had gone home and gone to bed. After being confronted with information that all of the others involved implicated him, he denied that he knew about the plan or that Sanford and Ponse were going to hurt Ibarra. Eventually, he admitted that Ponse shot Ibarra and that Sanford got mad because he had wanted to do it. He said that Ponse was standing and Ibarra was on the ground when he shot him.

Rhymes also said that Sanford attacked Ibarra at Ibarra's house and that he took Wohlford downstairs to keep her from getting hurt, but he maintained that he did so because he did not know what was going on. He stated that Sanford had tied Ibarra up with some flimsy tape and that Sanford had told Ibarra that his father owed him some money. Rhymes then told the officers about the plan to plant drugs on Ibarra and the acquisition of the methamphetamine from his cousin. He also initially denied any knowledge about Sanford stealing gloves from Walmart, but later confirmed that they stole three pairs of gloves and identified the type of gloves. In addition, he

13

confirmed that Sanford, Ponse, and he all wore the gloves that night, but maintained that he had only worn them to break them in as work gloves. He also said that they had put tape around Ibarra's hands and around his mouth.

Rhymes' testimony from his aggravated kidnapping trial was also read to the jury. Rhymes testified that he had helped Wohlford get methamphetamine to set up Ibarra and get him out of her house, but that that plan was abandoned. He maintained that Sanford, Ponse, and Wohlford devised the plan to kidnap Ibarra, but that he did not think they were serious. He admitted that he, Sanford, and Ponse had consumed the methamphetamine before going to Ibarra's house. Although he knew Ponse had a gun, he claimed that he did not know that he brought it until they got to Ibarra's house.

Rhymes testified that, when they got to Ibarra's house, Wohlford had left the door unlocked and that he knew she would. He also said that he knew Ponse had a gun when they walked into the house. He admitted that his job was to get Wohlford out of harm's way when Sanford and Ponse jumped Ibarra. Rhymes also testified that, after they took Ibarra downstairs, they drove him to the wooded area where his body was later found. When they arrived, they removed Ibarra from the car and walked him into the woods where he tripped and fell. As Ibarra started to lift his head, Ponse shot him. Rhymes also admitted that he was part of both kidnapping Ibarra and of Ibarra being taken out in the woods and shot.

The State's evidence also showed that while the Titus County Sheriff's Office was investigating the kidnapping in the early morning hours of February 20, Wohlford found out that they were using cell phone towers to locate Ibarra's cell phone, which the perpetrators had taken

14

with them. Almost immediately, a text message was sent from Wohlford's cell phone to Rhymes' cell phone that read, "Kill [Ibarra's] phone. Shut that s*** down." A couple of hours later, when Wohlford found out the investigating officers had found a location for Ibarra's cell phone, a second text message was sent from Wohlford's cell phone to Rhymes' cell phone stating, "Ditch phone. Move." Although Rhymes claimed that he no longer owned the cell phone and had given it to Ponse, other evidence showed that he had used the cell phone to call and send text messages to relatives and friends shortly before and after the kidnapping and murder.

In addition, testimony from Dr. Janis Townsend-Parchman, who performed the autopsy on Ibarra, established that he was killed by a single shot to the back of his head. She also testified that there were abrasions around the entry wound of the gunshot that indicated that the muzzle of the gun was pressed against the scalp. She said that this type of wound is commonly called an execution-style gunshot wound. Testimony from investigating officers showed that a bullet casing found at the murder scene had been fired from the firearm found underneath Rhymes' house.

### C.     Analysis

Rhymes argues that this evidence does not establish that anyone intentionally shot Ibarra. Although he concedes that Ponse and Sanford planned to shoot Ibarra, he argues that the evidence shows that Ibarra and Ponse tripped and that the gun was accidentally fired. However, Sanford never testified that Ponse tripped, only Ibarra. He also testified that Ponse shot Ibarra as he was trying to get to his knees. Further, in his recorded statement, Rhymes stated that Ponse was standing and Ibarra was on the ground when Ponse shot him. Also, the evidence showed that the firearm was pressed against Ibarra's scalp when it was fired. Finally, "[a] firearm is a deadly

15

weapon per se," and "[i]ntent to kill may be inferred from the use of a deadly weapon." *Williams v. State*, 502 S.W.3d 262, 270 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Based on this evidence, coupled with Sanford's testimony that they planned to kill Ibarra, a reasonable jury could infer that Ponse intentionally or knowingly caused the death of Ibarra.

Rhymes also argues that the evidence does not establish that Rhymes intentionally or knowingly assisted in the murder. Rhymes argues that the evidence shows that he did not think Sanford and Ponse were serious when they were planning the kidnapping and murder and that, by the time he realized they were serious, he was afraid to back out. However, although Sanford testified that he did not think Rhymes realized fully what they were going to do, he also stated that Rhymes was aware of the plan from the beginning and never objected to it. In addition, Rhymes accompanied Sanford in preparation for the execution of the plan, assisting him in removing the car seats from Wohlford's car and in shoplifting gloves from Walmart.

Also, Rhymes admitted to assisting in both kidnapping Ibarra and taking him to the woods where he was shot. The evidence also showed that Wohlford sent her warnings regarding Ibarra's cell phone to Rhymes, indicating that he fully participated in all aspects of the planning and execution of the kidnapping and murder. Further, a reasonable jury could choose to not believe Rhymes' claim that he did not know the plan was serious and that he was afraid to back out once he realized it was, considering the multiple prevarications made by him in his custodial statement.

Accordingly, we find the evidence is sufficient to support a finding that Rhymes intentionally assisted Ponse and Sanford in the murder of Ibarra. We overrule Rhymes' first point of error.

16

**III. The Trial Court Did Not Err in Denying Rhymes' Motion to Quash**

**A. Introduction**

In his second point of error, Rhymes complains that the trial court erred in denying his motion to quash because of prosecutorial and judicial vindictiveness. Rhymes argues that, since he received a twenty-three-year sentence in Titus County for the aggravated kidnapping charge, trying him for murder in Camp County is evidence of prosecutorial vindictiveness, i.e., retribution by the prosecutor for the less-than-anticipated sentence he received in Titus County. In addition, he argues that the trial court's decision to run his seventy-five-year sentence in this case consecutively to his Titus County sentence is evidence of judicial vindictiveness.

**B. Rhymes Failed to Preserve His Judicial Vindictiveness Complaint**

Initially, we note that Rhymes' assertion of judicial vindictiveness has been raised for the first time on appeal. In order to preserve an issue for appellate review, the record must show that the appellant (1) made a timely complaint to the trial court by a request, objection, or motion (2) that stated the complaint with sufficient specificity to make the trial court aware of the complaint and (3) obtained a ruling, or a refusal to rule, by the trial court. *See* TEX. R. APP. P. 33.1(a). We have reviewed the record, including Rhymes' motion to quash, the transcript of the hearing on the same, the trial transcript, Rhymes' motion for new trial, and the transcript of the hearing on the same. No allegation of judicial vindictiveness was raised in the trial court. As we have previously held, an issue of judicial vindictiveness is not preserved for appellate review when the appellant does not meet the requirements of Rule 33.1. *Rosborough v. State*, No. 06-06-00237-CR, 2007 WL 2033762, at *2 (Tex. App.—Texarkana July 17, 2007, no pet.) (mem. op., not

17

designated for publication).[9]  Therefore, Rhymes has not preserved any issue related to judicial vindictiveness for our review.[10]

### C.  Rhymes Failed to Establish Prosecutorial Vindictiveness

#### 1.  Standard of Review

Both Texas and federal courts recognize that "the decision whether to prosecute and what charge to file generally rests entirely within [a prosecutor's] discretion." *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004) (quoting *State v. Malone Serv. Co.*, 829 S.W.2d 763, 769 (Tex. 1992) (Gonzalez, J., concurring); *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).  Further, "[c]ourts must presume that a criminal prosecution is undertaken in good faith and in nondiscriminatory fashion to fulfill the State's duty to bring violators to justice." *Id.* (citing *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980)).  In certain limited circumstances, however, this presumption of good-faith prosecution may "give[] way to either a rebuttable presumption of prosecutorial vindictiveness or proof of actual vindictiveness." *Id.*

To be entitled to a rebuttable presumption of prosecutorial vindictiveness, the "defendant must prove that he was convicted, he appealed and obtained a new trial, and that the State thereafter

---

[9]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

[10]Even if this issue had been preserved for our review, Rhymes argues that a presumption of judicial vindictiveness, as recognized in *North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989), should apply in this case.  However, a presumption of judicial vindictiveness only applies when the defendant has successfully appealed his conviction and the trial court imposes a more severe punishment after a new trial without affirmatively stating its reasons for the increased sentence. *Id.* at 724–26; *Rosborough*, 2007 WL 2033762, at *2.  Consequently, as in the prosecutorial vindictiveness presumption discussed below, to be entitled to the presumption, the defendant must show that he has successfully appealed his original conviction and received a more severe punishment after his new trial.  In this case, there has been neither a successful appeal nor a new trial. Therefore, the presumption would not apply, and Rhymes would not be entitled to relief.

18

filed a greater charge or additional enhancements." *Id.* at 174. The State can then overcome the presumption by presenting "an explanation for the charging increase that is unrelated to the defendant's exercise of his legal right to appeal." *Id.* (citing *United States v. Krezdorn*, 693 F.2d 1221, 1229 (5th Cir. 1982)). If the presumption does not apply, in order to obtain relief the defendant must show actual vindictiveness. *Id.* (citing *Texas v. McCullough*, 475 U.S. 134, 138 (1986)). This requires the defendant to "prove, with objective evidence, that the prosecutor's charging decision was a 'direct and unjustifiable penalty' that resulted 'solely from the defendant's exercise of a protected legal right.'" *Id.* (quoting *U.S. v. Goodwin*, 457 U.S. 368, 384 & n.19 (1982)). To show actual vindictiveness, "the defendant shoulders the burden of both production and persuasion, unaided by any legal presumption." *Id.* (citing *United States v. Sarracino*, 340 F.3d 1148, 1177–79 (10th Cir. 2003); *United States v. Moulder*, 141 F.3d 568, 572 (5th Cir. 1998)).

### 2.    Analysis

In this case, there has been no previous appeal that resulted in a new trial. Rather, this is the first appeal of Rhymes' original conviction. Therefore, Rhymes is not entitled to a presumption of prosecutorial vindictiveness. *Id.* Rhymes, then, had to show actual vindictiveness. At the hearing on his motion to quash, Rhymes made an argument, but he offered no objective evidence to show actual prosecutorial vindictiveness. Argument of counsel is not evidence. *Cary v. State*, 507 S.W.3d 750, 755 (Tex. Crim. App. 2016). In his brief, Rhymes points only to the facts that (1) he was tried for aggravated kidnapping in Titus County and received a twenty-three-year sentence, (2) he received a seventy-five year sentence in this case, which the trial court ordered that he serve consecutively, and (3) both Titus and Camp County are served by the same district

19

attorney and the same presiding judges. None of these facts, whether separately or taken together, show actual prosecutorial vindictiveness.

### D. Summary

Since Rhymes has not shown prosecutorial vindictiveness and has preserved no issue regarding judicial vindictiveness, we find that the trial court did not err in denying Rhymes' motion to quash. We overrule his second point of error.

## IV. Rhymes Has Not Shown Ineffective Assistance of Counsel

### A. Introduction

In his third point of error, Rhymes complains that he received ineffective assistance of counsel. Rhymes bases his complaint on the conduct of his trial counsel, who also represented him in the appeal of his aggravated kidnapping conviction, in convincing him to dismiss his appeal of that conviction, thereby allowing that conviction to become final. Rhymes argues that the finality of the aggravated kidnapping conviction had two devastating effects: (1) it allowed the State to introduce his prior testimony from that proceeding in this trial and (2) it allowed the trial court to run his sentence consecutively to his prior sentence.

### B. Standard of Review

As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*. 466 U.S. 668, 687–88 (1984); *see also Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). The first prong requires a showing that counsel's performance

20

fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). Moreover, where the reviewing court "can conceive potential reasonable trial strategies that counsel could have been pursuing," the court "simply cannot conclude that counsel has performed deficiently." *Id.* at 103. When a defendant raises an ineffective assistance of counsel claim for the first time on direct appeal, he must show that "under prevailing professional norms," *Strickland*, 466 U.S. at 688, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do. *See Andrews*, 159 S.W.3d at 102.

The second *Strickland* prong, sometimes referred to as "the prejudice prong," requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, in order to establish prejudice,

> an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." [*Strickland*, 466 U.S.] at 687. . . . It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693 . . . . Rather, [he]

21

> must show that "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695.

*Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

The appellant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (quoting *Thompson*, 9 S.W.3d at 813). The *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)). A failure to make a showing under either prong defeats a claim for ineffective assistance. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

### C. Analysis

Rhymes has failed to show that his trial counsel erred in advising him to dismiss his appeal of the aggravated kidnapping conviction, or that such advice fell below a reasonable professional standard. Rhymes argues first that by allowing the aggravated kidnapping conviction to become final, his testimony in that proceeding became admissible in the trial of this case. Rhymes has cited no authority, and we have found none, that requires the prior proceeding to be final before testimony given in that proceeding is admissible in a subsequent proceeding.

22

Further, under certain circumstances, Rule 804(b)(1)(B) allows the admission of a witness' testimony in a prior proceeding when that witness is unavailable as a witness[11] in the trial. In a criminal prosecution, former testimony is admissible if (1) the declarant is unavailable to testify, (2) the current proceeding includes the same charges, parties, and issues as the former proceeding, and (3) the party against whom the testimony is offered had an opportunity and similar motive to develop the former testimony at the prior proceeding.[12] *Davis v. State*, 961 S.W.2d 156, 158 (Tex. Crim. App. 1998) (Baird, J., concurring) (citing *Bryan*, 837 S.W.2d 637). Notably, finality of the prior proceeding is not a prerequisite to the admission of the defendant's former testimony. Consequently, the dismissal of Rhymes' appeal of the aggravated kidnapping conviction did not affect the admissibility of his former testimony.

Rhymes also argues that the finality of the aggravated kidnapping conviction allowed the trial court to run his sentence consecutively to the sentence received in that case. When a defendant has been convicted in two or more cases, the Texas Code of Criminal Procedure gives the trial court discretion in the second and subsequent cases to run the sentence(s) consecutively to the sentence received in the preceding case. *See* TEX. CODE CRIM. PROC. ANN. art. 42.08(a) (West Supp. 2017). Rhymes has cited no authority, and we have found none, that requires the preceding case to be final before the trial court is authorized to run the sentence in a subsequent case

---

[11]A defendant that invokes his Fifth Amendment privilege not to testify becomes unavailable as a witness. *See Bryan v. State*, 837 S.W.2d 637, 644 (Tex. Crim. App. 1992), *abrogated on other grounds by Trevino v. State*, 991 S.W.2d 849 (Tex. Crim. App. 1999).

[12]There is nothing in the record that shows these prerequisites were not satisfied.

23

consecutively to the sentence received in the preceding case. Thus, the dismissal of Rhymes' appeal did not affect the trial court's authority to run his sentence consecutively.

Since the dismissal of his appeal had no effect on the admissibility of Rhymes' former testimony, or on the trial court's authority to run his sentence consecutively, Rhymes has failed to demonstrate any error by his trial counsel that fell below a reasonable professional standard. Therefore, we overrule his third point of error.

## V.    Conclusion

For all of the foregoing reasons, we affirm the judgment of the trial court.


Ralph K. Burgess
Justice


Date Submitted:     November 20, 2017
Date Decided:       December 12, 2017

Publish

24